**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01759-STV

JASON HARTER,

      Plaintiff,

v.

CHAFEE COUNTY, and
DEPUTY STOVER,

      Defendants.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Defendants' Motion for Summary Judgment (the "Motion"). [#30] The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [#16, 17] The Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## I.   UNDISPUTED FACTS[1]

This case arises out of Defendants'[2] alleged failure to protect Plaintiff from being assaulted by an inmate, Alan Stephen, while Plaintiff was a pretrial detainee at the Chafee County Detention Center ("CCDC").  [#1]  At all relevant times, Defendant Victoria Stover was employed as a deputy at the CCDC.  [#43, SOF 6]

On February 20, 2020, Plaintiff was arrested on charges of kidnapping, forcible rape of an individual under the age of 15, and enticement.  [*Id.* at SOF1]  Due to these charges, it was generally known among jail staff including Defendant Stover that it was important that other inmates not learn of Plaintiff's charges.  [*Id.* at SOF65]  And on March 10, 2020, Tracy Jackson, the Detentions Commander at the CCDC, sent an email to all CCDC security staff advising staff that if they witnessed any type of harassment from inmates directed at Plaintiff they needed to stop it and address it.   [*Id.* at SOF7]  Commander Jackson also advised staff that she had spoken to two specific inmates and reminded them that any harassing behavior would not be tolerated.  [*Id.*]

On July 16, 2020, Plaintiff engaged in an altercation with Joshua Mullins, another CCDC inmate.  [*Id.* at SOF9]  Mr. Mullins apparently made derogatory comments toward

---

[1] The undisputed facts are drawn from the Separate Statement of Undisputed Material Facts filed with the briefing on the Motion (the "Statement of Facts").  [#43]  The Court refers to the sequentially numbered facts set forth in the Statement of Facts as "SOF#" and periodically cites directly to the exhibits cited by the parties in the Statement of Facts to provide additional context.  The material facts are undisputed except as specifically identified.

[2] The Complaint initially named as Defendants: Chafee County, Lieutenant Justin Martinez, Commander Tracy Jackson, Deputy Victoria Stover, Sergeant Claude Maez, and Sergeant Joseph Veltri.  [#1]  After Defendants filed their Motion, on August 15, 2023, Plaintiff filed a stipulated motion to dismiss Defendants Martinez, Jackson, Maez, and Veltri.  [#37]  Thus, as of this Order, only Chafee County and Deputy Stover remain as Defendants.

Plaintiff's wife and children, and Plaintiff reacted angrily.  [*Id.*]  Plaintiff threw a punch at Mr. Mullins but did not make contact.  [*Id.* at SOF10]  As a result of the altercation, Plaintiff was moved to D pod, a single cell living arrangement for inmates, and placed on protective custody ("PC") lockdown.  [*Id.*]  PC lockdown is the confinement of an inmate for his own safety due to the nature of the inmate's charges and/or the inmate's fear of injury.  [*Id.* at SOF11]  Inmates on PC lockdown are served all meals in their cells and permitted one hour per 24-hour period out of their cells.  [*Id.*]

The same day as his move to D pod, Plaintiff sent a kite expressing concerns about Mr. Stephen.  [*Id.* at SOF12; *see also* #30-5]  Mr. Stephen had nine days earlier been booked into the CCDC on charges related to drugs, identity theft, and forgery.  [#43, SOF8]  In the kite, Plaintiff described Mr. Stephen as an "extremely violent person" and indicated that he would feel safer being isolated in holding.  [*Id.* at SOF12; *see also* #30-5]  Plaintiff believed that Mr. Stephen was a violent person because: (1) Plaintiff believed that Mr. Stephen had previously been charged with killing his brother,[3] and (2) Mr. Stephen had given Plaintiff certain looks.  [#43, SOF12]

Shortly after Plaintiff submitted his kite regarding Mr. Stephen, CCDC Corporal Claude Maez and Deputy KJ Harris spoke to Plaintiff about his concerns.  [*Id.* at SOF13]  As Corporal Maez and Deputy Harris attempted to escort Plaintiff back to his cell, Plaintiff sat down on a chair and refused to return.  [*Id.* at SOF14]  Eventually, in response to orders by Corporal Maez, Plaintiff returned to his cell.  [*Id.*]  Once Plaintiff was locked in

---

[3] On August 5, 2019, Mr. Stephen had been briefly detained in the CCDC for investigation of a second-degree murder charge related to the death of his brother.  [*Id.* at SOF12 n.2] The following day he was released without charges because law enforcement determined that his actions were self-defense.  [*Id.*]

his cell, he began kicking the cell door and attempted to flood his cell, thereby requiring Corporal Maez and Deputy Harris to turn off the water to Plaintiff's cell.  [*Id.* at SOF15] Plaintiff's behavior was prompted by the fact that he did not want to be placed on PC lockdown.  [*Id.* at SOF16]  In fact, during his incarceration in the CCDC, Plaintiff did not request to be placed on lockdown.  [*Id.* at SOF17]

On July 17, 2020, Plaintiff was disciplined for his behavior and was placed on administrative lockdown in D pod for approximately one month.  [*Id.* at SOF 20] Administrative lockdown is the confinement of an inmate because he is a danger to himself, other inmates, staff and/or the facility.  [*Id.* at SOF21]  Inmates on administrative lockdown are served all meals in their cells and permitted one hour per 24-hour period out of their cells.  [*Id.*]  The safety protocols inherent in PC lockdown and administrative lockdown are the same.  [*Id.* at SOF 22]

On July 20, 2020, Commander Jackson responded to Plaintiff's July 16 kite.  [*Id.* at SOF18]  At the time, Plaintiff was still being housed in administrative lockdown.  [*Id.*] Defendants contend that Plaintiff could not be placed in one of the holding cells because those cells are utilized for intake purposes only and not for inmate housing.  [*Id.*]

On July 22, 2020, Mr. Stephen was moved to G pod for reasons apparently unrelated to Plaintiff's kite.  [*Id.* at SOF19]  On August 15, 2020, Plaintiff was released from lockdown back into D pod's general population.  [*Id.* at SOF24]  On August 23, 2020, Mr. Stephen was moved from G pod to D pod, apparently because Mr. Stephen had been accused of stealing other inmates' property.  [*Id.* at SOF25]

On September 11, 2020, Plaintiff threw a sandwich that he had been provided for lunch against the glass door above D pod because he was frustrated by the food available

to vegetarians like himself.  [*Id.* at SOF26]  After Lieutenant Justin Martinez and another deputy escorted Plaintiff to his cell, Plaintiff forcefully kicked his cell door and screamed profanities.  [*Id.* at SOF27]  As a result, Lieutenant Martinez placed Plaintiff on administrative lockdown until further notice.  [*Id.* at SOF28]

That same day, Mr. Stephen submitted a kite regarding Plaintiff.  [*Id.* at SOF29; *see also* #30-13]  Mr. Stephen referenced Plaintiff's behavior at lunch and advised that, because of Plaintiff's comments earlier in the day, Mr. Stephen would need to be removed from the pod when Plaintiff was taken off lockdown.  [*Id.*]  Specifically, Mr. Stephen said that Plaintiff told Mr. Stephen "how he felt" and Mr. Stephen told Plaintiff how Mr. Stephen felt "about people that like to rape 13 [year] old little girls and what should happen to them."  [#30-13]  Mr. Stephen advised that there "most certainly" would be an altercation between him and Plaintiff if they were in the day room together.  [*Id.*]  Corporal Joseph Veltri notified Lieutenant Martinez of Mr. Stephen's kite and informed all of the deputies on duty to keep Plaintiff in his cell until all inmates in D pod were locked down.  [#43, SOF30]

The next day, Plaintiff submitted two kites regarding Mr. Stephen.  [*Id.* at SOF 32; *see also* #30-15]  The first related to Mr. Stephen's possession of water bottles that Plaintiff believed could be used as weapons against him.  [*Id.*]  The second related to Mr. Stephen's threats against Plaintiff.  [*Id.*]  Though not detailed in the kite, Mr. Stephen had told Plaintiff that Plaintiff was going to end up like Mr. Stephen's brother, that Mr. Stephen was going to find Plaintiff on the outside if he got released, and that he knew people in the prison system that he could send letters to and thus Plaintiff could not hide from anybody.  [##43, SOF33; 30-15]

That same day, Deputy Adrian Pugh responded to Plaintiff's September 12 kites. [#43, SOF35; *see also* #30-15]  Deputy Pugh reminded Plaintiff that he was on lockdown and therefore had no interactions with Mr. Stephen.  [*Id.*]  On September 13, 2020, Corporal Veltri responded to Mr. Stephen's September 11 kite.  [#43, SOF31; *see also* #30-13]  Corporal Veltri told Mr. Stephen that he would make sure that Lieutenant Martinez was aware of Mr. Stephen's kite.  [#30-13]

Defendant maintains that moving Plaintiff or Mr. Stephen to different pods was logistically impractical for two reasons.  [#43, SOF36]  First, the only other pod was G pod and both Mr. Stephen and Plaintiff had already been removed from G pod.  [*Id.*]  Second, CCDC is a small facility and the COVID-19 pandemic required the facility to utilize the various general housing pods for isolation and quarantine purposes.  [*Id.*]  Plaintiff maintains that he could have been placed in a holding cell.  [*Id.*]  Alternatively, Plaintiff maintains that: (1) he could have been placed in C pod, as he was after the attack detailed below, or (2) Mr. Stephen could have been moved to G pod, as he was in October 2020. [*Id.*]

Between July 16, 2020, when Plaintiff wrote the kite expressing concerns about Mr. Stephen, and September 14, 2020, Plaintiff did not have any in-person interactions with Mr. Stephen.[4]  [*Id.* at SOF23]  On September 15, 2020, Plaintiff was on administrative lockdown in D pod and had been informed by Lieutenant Martinez that he would not be removed from lockdown.  [*Id.* at SOF37, SOF38]  Corporal Maez decided to assist Deputy

---

[4] The parties do not dispute this fact.  [*Id.* at SOF23]  It is not entirely clear to the Court how Mr. Stephen could have threatened Plaintiff as detailed in Plaintiff's second September 12 kite without the two individuals having any in-person interaction. Ultimately, this fact does not impact the Court's analysis.

McDonald with serving dinner in D pod because he recalled Lieutenant Martinez briefing him prior to his shift about tension between Plaintiff and Mr. Stephen.  [*Id.* at SOF39]

Meanwhile, Defendant Stover was assigned the 6:00 p.m. to 6:00 a.m. shift in the control room.  [*Id.* at SOF41]  Defendant Stover testified that she had returned to work that day after her regularly scheduled days off and had arrived to work late, thereby missing the pre-shift briefing by Lieutenant Martinez.  [*Id.* at SOF40, SOF42]  As a result, Defendant Stover testified to being unaware of Plaintiff's kites concerning Mr. Stephen, Mr. Stephen's kite concerning Plaintiff, or of any tension between Plaintiff and Mr. Stephen.  [*Id.* at SOF62-SOF64]  Nonetheless, Defendant Stover was aware that Plaintiff was on administrative lockdown.  [*Id.* at SOF43]

When Corporal Maez and Deputy McDonald arrived at D pod to serve dinner to the inmates, Defendant Stover heard the trap door close and she opened the D pod door to allow them entry into the pod.  [*Id.* at SOF45]  Approximately one minute later, Defendant Stover opened Plaintiff's cell door.  [*Id.*] The parties dispute whether Deputy Stover could have observed Plaintiff's cell door from the control room through a live video feed.  [*Id.*]  The parties agree, however, that, prior to opening the cell door of an inmate in administrative lockdown, jail protocol requires a control room deputy to wait until another deputy signals in some manner to the control room that the second deputy is in front of the cell door.  [*Id.* at SOF46]

Defendant Stover has given two explanations for unlocking Plaintiff's cell door.  [*Id.* at SOF 69]  Initially, in discovery responses, she stated that she accidentally unlocked the cell door because she mistakenly pressed the unlock button when she intended to press the intercom button.  [*Id.*]  When the cell door was unlocked, a red light would have

come on that should have alerted Defendant Stover to the inadvertent opening of the cell door, and the cell door could have been immediately locked.  [#40-5 at 10-11 (84:5-85:10)] Later, Defendant Stover amended this response to state that she intentionally unlocked the door because she believed that Corporal Maez and Deputy McDonald had entered D pod and were in front of Plaintiff's cell door.  [#43, SOF69]

At the time Defendant Stover opened Plaintiff's cell door, Corporal Maez and Deputy McDonald were not located outside Plaintiff's cell.  [*Id.* at SOF49 (Corporal Maez asserting that he was shocked that Plaintiff's cell door was unlocked)]  Mr. Stephen, meanwhile, had been sitting right outside Plaintiff's cell.  [*Id.* at SOF45]  When Plaintiff heard his cell door unlock, he pushed the cell door open and left his cell.  [*Id.* at SOF47] Plaintiff testified that he did so because he wanted his altercation with Mr. Stephen to be recorded and there were no surveillance cameras inside the cells.  [*Id.*]  Plaintiff then held up his hands to protect himself and Mr. Stephen punched Plaintiff several times in the face.  [*Id.* at SOF48]  Upon seeing the altercation, Corporal Maez and Deputy McDonald responded and were able to separate Plaintiff and Mr. Stephen and place Plaintiff back into his cell.  [*Id.* at SOF49, SOF51]

As a result of Mr. Stephen's assault, Plaintiff suffered serious physical injuries.  [*Id.* at SOF82]  These included an orbital wall fracture, swelling in the facial region, and extreme pain.  [*Id.*]  About a month after Mr. Stephen attacked Plaintiff, command staff at the jail elevated him to trustee status, a position that was never offered to Plaintiff.  [*Id.* at SOF86-87]  Mr. Stephen's status as a trustee potentially reduced his sentence and potentially gave him access to Plaintiff's food.  [*Id.* at SOF89-90]  Corporal Maez has testified that elevating Mr. Stephen to trustee was a "flat out terrible idea."  [*Id.* at SOF88]

In the approximately five years that she was employed at CCDC, Defendant Stover had previously improperly unlocked inmates' cell doors on three occasions. [*Id.* at SOF76] One of these incidents involved Defendant Stover unlocking the cell door of an inmate who was in protective custody and that inmate being physically attacked by another inmate as a result. [*Id.* at SOF76-77] As a result of these prior actions, Defendant Stover received a verbal reprimand in one instance and a written reprimand in another. [*Id.* at SOF 76] As a result of improperly locking Plaintiff's door, Chaffee County suspended Defendant Stover for one day and placed her on three months' probation. [*Id.* at SOF79] Chaffee County did not train Defendant Stover any differently as a result of her actions in opening Plaintiff's door. [*Id.* at SOF80]

On July 15, 2022, Plaintiff filed the instant lawsuit, asserting a single cause of action against Defendants pursuant to 42 U.S.C. § 1983 for failure to protect in violation of the Fourteenth Amendment of the United States Constitution. [#1] On July 28, 2023, Defendants filed the instant motion seeking summary judgment on Plaintiff's cause of action against them. [#30] Plaintiff has responded to the Motion [#39] and Defendants have replied [#42].

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact, which the movant may do "simply by pointing out to the court a lack of

evidence . . . on an essential element of the nonmovant's claim" when the movant does not bear the burden of persuasion at trial. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 248-49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment must be based on more than mere speculation, conjecture, or surmise. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In reviewing a motion for summary judgment, the Court "view[s] the evidence

and draw[s] reasonable inferences therefrom in the light most favorable to the non-moving party."  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

## III.    ANALYSIS

Defendant Stover moves for summary judgment on Plaintiff's claim that she violated Plaintiff's Fourteenth Amendment rights, arguing that the undisputed facts demonstrate that she did not violate Plaintiff's constitutional rights and that, in any event, she is entitled to qualified immunity.  [#30 at 2-15]  Defendant Stover further argues that she is entitled to summary judgment on Plaintiff's punitive damages claim because there is insufficient evidence to demonstrate that she acted with malice, evil intent or motive, or knew that her actions were unconstitutional.  [*Id.* at 19-20]  Defendant Chaffee County argues that it is entitled to summary judgment because the undisputed facts demonstrate that there is insufficient evidence to support a municipal liability claim against it.  [*Id.* at 15-19]  The Court addresses each argument in turn.

### A.    Claim Against Defendant Stover

Defendant Stover first argues that the undisputed facts demonstrate that she did not violate Plaintiff's constitutional rights.  [#30 at 12-13]  Next, Defendant Stover argues that she is entitled to qualified immunity because "Plaintiff cannot demonstrate that every reasonable detention official in Defendant Stover's position as a CCDC deputy assigned to the control room would have known that her conduct in September 2020 was unconstitutional."  [*Id.* at 15]  Finally, Defendant Stover argues that Plaintiff's punitive damages claim fails because there is no evidence that Defendant Stover acted with malice, evil intent, or motive.  [*Id.* at 19-20]  The Court addresses each argument in turn.

### 1.    Constitutional Violation for Failure to Protect

Plaintiff alleges that Defendants violated his Fourteenth Amendment rights by failing to protect him from the threat to Plaintiff's safety posed by Mr. Stephen.[5] [#1]  The Eighth Amendment protects a prisoner's right to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Prison officials are required to "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and . . . tak[e] reasonable measures to guarantee the inmates' safety."  *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998).  As part of this obligation to take reasonable measures to guarantee an inmate's safety, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotations omitted).  "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Id.* at 834 (quotations omitted).

That said, not every instance of inmate-on-inmate violence "translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834. Instead, to establish an Eighth Amendment violation, the victim must establish two

---

[5] Because Plaintiff was a pretrial detainee at the time of the attack, his deliberate indifference claim is properly brought under the Due Process Clause of the Fourteenth Amendment.  *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir.1998).  Nonetheless, because the Eighth Amendment standard provides the benchmark for Plaintiff's failure to protect claims, *Craig*, 164 F.3d at 495, the Court borrows from Eighth Amendment deliberate indifference precedent. *Routt v. Howard*, 764 F. App'x 762, 770 (10th Cir. 2019) (noting that the district court correctly acknowledged that the Due Process Clause governed the plaintiff's claims as a pretrial detainee and further correctly noted that the Eighth Amendment provided the benchmark for such claims).

requirements.  First, there is an objective component in that the deprivation must be "sufficiently serious" such that the prisoner is denied "the minimal civilized measure of life's necessities."  *Id.* (quotations omitted).  "In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective 'substantial risk of serious harm.'"  *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008) (quoting *Farmer*, 511 U.S. at 833).  Second, there is a subjective requirement that the prison official have a "deliberate indifference" to the inmate's health or safety.  *Farmer*, 511 U.S. at 839-40.  This deliberate indifference is akin to recklessness as used in the criminal law.  *See id.* at 839; *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) ("The subjective component is akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." (quotations omitted)).  "The subjective component of the deliberate indifference test requires that, before liability can be imposed, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[6]  *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir.1998)).

---

[6] Even where both the objective and subjective components of a deliberate indifference claim have been proven, a constitutional violation may not exist.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844-45.  Defendant Stover, however, has not argued that she acted reasonably in response to a substantial risk of harm to Plaintiff.  Instead, Defendant Stover argues only that Plaintiff has not adduced sufficient evidence to support the subjective component of his deliberate indifference claim.  [##30 at 12-13; 42 at 5]  The Court thus does not consider in this Order the reasonableness of Defendant Stover's response to any known threat to Plaintiff's safety.

In the Motion, Defendant Stover argues that Plaintiff has failed to offer sufficient evidence to create an issue of material disputed fact with regard to the subjective component of Plaintiff's failure to protect claim.[7]  [#30 at 12-13]  To satisfy the subjective element, Plaintiff must present evidence sufficient to support a reasonable juror finding that Defendant "both [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[ew] the inference." *Verdecia*, 327 F.3d at 1175 (quotation omitted).  The Court concludes that Plaintiff has satisfied this standard.  Even if a jury believes Defendant Stover's testimony that she was unaware of the recent kites because she was late for the morning briefing, she nonetheless knew that Plaintiff's charges put him at heightened risk and submitted discovery responses

---

[7] Defendant Stover does not appear to directly challenge the objective component of Plaintiff's deliberate indifference claim.  [#30 at 12 ("In sum, the record is devoid of any credible evidence to establish the subjective component of the deliberate indifference test.")]  Even if she did challenge the objective element, however, the Court would find that Plaintiff has presented sufficient evidence for a reasonable jury to conclude that the objective component had been satisfied.  To satisfy the objective element, Plaintiff must present evidence sufficient to support a jury's finding that "the conditions of his incarceration present[ed] an objective substantial risk of serious harm." *Howard*, 534 F.3d at 1236 (quotation omitted).  Here, Plaintiff submitted a kite informing CCDC staff that Mr. Stephen had threatened him and Mr. Stephen himself submitted a kite informing CCDC staff that he would harm Plaintiff if given the opportunity.  [#43, SOF30, SOF32]  And even if Defendant Stover was unaware of those specific threats, the objective component of a failure to protect claim does not require the plaintiff to demonstrate that he faced a substantial risk of harm from a specific individual or at a specific time.  Rather, as the Supreme Court has explained, a prison official may not "escape liability for deliberate indifference by showing that . . . he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843.  And "it does not matter whether the risk comes from a single source or multiple sources." *Id.*  Indeed, "prison officials may be aware of a substantial risk of harm even where no outright threat has occurred." *Howard*, 534 F.3d at 1239.  Here, at a minimum, Defendant Stover knew that Plaintiff's charges put him at heightened risk and further submitted discovery responses indicating that she knew Plaintiff was in protective custody.  [#43, SOF43, SOF62, SOF66]  The Court thus finds the objective component of Plaintiff's deliberate indifference claim satisfied.

indicating that she knew Plaintiff was in protective custody. [#43, SOF43, SOF62, SOF66] Moreover, according to jail protocol, a control room deputy must wait until another deputy signals, in some manner, to the control room that the second deputy is in front of the cell door prior to opening the cell door of an inmate in administrative lockdown. [*Id.* at SOF46] Despite this requirement, Defendant Stover opened Plaintiff's door without obtaining such a signal—indeed, she testified that she could not even see what was going on inside the D pod. [#41 at 20 (113:3-15)] These facts could allow a reasonable jury to conclude that Defendant Stover was subjectively aware of the substantial risk of harm Plaintiff faced when Defendant Stover unlocked Plaintiff's cell door.

Additionally, the exact circumstances surrounding Defendant Stover's unlocking of the cell door are disputed. Again, Defendant Stover has provided contradictory explanations for unlocking Plaintiff's cell door. [#43, SOF69] And though Defendant Stover testified that she was unable to see what was going on inside D pod when she opened the door, Corporal Maez testified that there was a direct line of sight from the control room into the D pod and that from the control board a guard would need to move only "a little bit" to look straight into D pod. [#40-5 at 7 (63:6-16)] Based upon these facts and Defendant Stover's contradictory discovery responses, a jury could choose to disbelieve Defendant Stover's testimony that she was unaware of what was going on inside D pod—*i.e.*, the jury could disbelieve Defendant Stover's testimony that: (1) she was unaware that Mr. Stephen was lurking outside Plaintiff's cell, and (2) she believed Corporal Maez and Deputy McDonald were outside Plaintiff's cell. *Durkee v. Minor*, 841 F.3d 872, 874-76 (10th Cir. 2016) (where inmate plaintiff testified that he could see into the booking room from the visitation room where plaintiff was located, jury could

disbelieve guard's testimony that he did not know that the plaintiff was in the visitation room when the guard unshackled a second inmate in the booking room who then ran into the visitation room and assaulted the plaintiff).  And if the jury disbelieves Defendant Stover's testimony, then her decision to open Plaintiff's door despite knowing that Plaintiff was in administrative protection and was at risk from other inmates, one of whom was lurking outside the cell, constitutes deliberate indifference.  *Id.*  Accordingly, the Court concludes that Plaintiff has elicited sufficient evidence, taken in the light most favorable to him, to allow a jury to conclude that Defendant Stover was deliberately indifferent to Plaintiff's safety and violated Plaintiff's Fourteenth Amendment rights.

## 2.    Qualified Immunity

Defendant Stover argues that even if she did violate Plaintiff's Fourteenth Amendment rights, she is nonetheless entitled to qualified immunity because "Plaintiff cannot demonstrate that every reasonable detention official in Defendant Stover's position as a CCDC deputy assigned to the control room would have known that her conduct in September 2020 was unconstitutional."  [#30 at 15]  The Court disagrees.

"Qualified immunity 'protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted)).  To defeat a claim of qualified immunity, a plaintiff must demonstrate: (1) a violation of a constitutional right, and (2) that the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  *See Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010).

The requirement that the right be clearly established presents a "demanding standard" intended to ensure the protection of "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).   In determining whether the constitutional right was clearly established at the time of the misconduct, the Tenth Circuit has explained:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate.  The dispositive question is whether the violative nature of the *particular conduct* is clearly established.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted). The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity."   *Wesby*, 138 S. Ct. at 591 n.8.  The Tenth Circuit, however, has stated that "[o]rdinarily this standard requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'"  *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).  The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Wesby*, 138 S. Ct. at 590 (quotation omitted).

The Court agrees with Plaintiff that the violative nature of Defendant Stover's conduct was clearly established as of September 15, 2020.  In *Durkee v. Minor*, decided in 2016, inmate Ricky Michael Ray Ramos had a history of aggressive behavior at the jail and had threatened deputies and other inmates, including the plaintiff.  841 F.3d at 874. After an argument between Mr. Ramos and the plaintiff, the plaintiff expressed concerns about Mr. Ramos.  *Id.*  A deputy issued an incident report stating that the plaintiff and Mr. Ramos could not attend any programs together or be in the hallways or booking area together.  *Id.*  Despite this incident report, Sergeant Ron Hochmuth unshackled Mr. Ramos in the booking area even though the plaintiff was in the adjacent visitation room with a mental health counselor.  *Id.* at 874-75.  Sergeant Hochmuth contended that he did not see the plaintiff in the visiting room.  *Id.* at 875.  Mr. Ramos took two steps toward the housing pod door, then suddenly turned around and ran into the visitation room through its unlocked door and assaulted the plaintiff.  *Id.*

The district court denied Sergeant Hochmuth's motion for summary judgment and Sergeant Hochmuth appealed that denial and the district court's rejection of Sergeant Hochmuth's qualified immunity defense.  *Id.* at 874.  On appeal, the Tenth Circuit affirmed the district court's decision with respect to Sergeant Hochmuth.[8]  *Id.* at 874-76.  In doing so, the Tenth Circuit reasoned:

> [W]here the facts as found by the district court show—as they do here—that a substantial risk of an inmate attack against Plaintiff was well-documented and expressly noted by prison officials prior to the attack in question, and those facts further show—as they do here—that Defendant Hochmuth was informed of and acknowledged the risk and was accompanying Ramos in an area where Ramos and Plaintiff were visible to each other, such facts

---

[8] The Tenth Circuit reversed the district court's denial of summary judgment with respect to a second defendant who plaintiff had sued based upon that defendant's supervisory liability.  *Id.* at 876-78.

are sufficient to permit a jury to find Hochmuth had actual knowledge of the risk and disregarded it.

*Id.* at 875-76.  Because "[t]he question  whether Defendant Hochmuth was aware of facts from which he drew the inference that a risk of harm to Plaintiff existed while in the visitation room is for the factfinder," the Tenth Circuit found that the plaintiff had elicited sufficient facts to survive summary judgment on the Eighth Amendment violation.  *Id.* at 876.  And with respect to the clearly established prong of the qualified immunity analysis, the Tenth Circuit "easily conclude[d] . . . that a reasonable officer cognizant of Plaintiff's presence in the unsecured visitation room would have understood that unshackling Ramos in the booking area posed a substantial harm to Plaintiff in violation of the Eighth Amendment."  *Id.* at 876 n.2.

So too here.  As explained above, based upon Corporal Maez's testimony, a jury could disbelieve Defendant Stover's testimony about what she observed inside D pod.  If it does, it could conclude that Defendant Stover opened Plaintiff's door despite knowing that Plaintiff was in administrative protection and was at risk from other inmates, one of whom was lurking outside the cell.  This Court "easily conclude[s] . . . that a reasonable officer cognizant of Plaintiff's presence in the unsecured [D pod] would have understood that [opening Plaintiff cell with Mr. Stephen lurking outside the cell] posed a substantial harm to Plaintiff in violation of the [Fourteenth] Amendment."  *Id.* at 876 n.2.  Accordingly, the Court DENIES Defendants' Motion to the extent it seeks summary judgment for Defendant Stover on Plaintiff's Fourteenth Amendment claim.

### 3.   Punitive Damages

Plaintiff's Complaint seeks punitive damages.  [#1 at 19]  In the Motion, Defendant Stover argues that she is entitled to summary judgment on the punitive damages claim

because Plaintiff cannot show that she acted with malice or knew that her actions were unconstitutional.   [#30 at 19-20]   In other words, as with her argument on the constitutionality of her conduct, Defendant Stover argues that Plaintiff has not presented evidence of Defendant Stover's subjective mindset.  [*Id.*]

Once again, the Court disagrees.  For the same reasons detailed above, the Court concludes that there is sufficient evidence in the record by which a jury could conclude that Defendant Stover had a subjective mindset that rose to the level of deliberate indifference to Plaintiff's constitutional rights.  As a result, the question of punitive damages should be left to the jury's determination.  *Smith v. Wade*, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). Accordingly, the Motion is DENIED to the extent it seeks summary judgment on Plaintiff's request for punitive damages.

## B.   Claim Against Chafee County

Defendant Chaffee County argues that it is entitled to summary judgment because the undisputed facts demonstrate that there is insufficient evidence to support a municipal liability claim against it.  [#30 at 15-19]  As a general rule, "municipalities and municipal entities . . . are not liable under 42 U.S.C. § 1983 solely because their employees inflict injury on a plaintiff."  *Fofana v. Jefferson Cnty. Sheriff's*, No. 11-cv-00132-BNB, 2011 WL 780965, at *2 (D. Colo. Feb. 28, 2011) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) and *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  Instead, "they are responsible only for their own actions."  *Simmons v. Uintah*

*Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007) (citing *Monell*, 436 U.S. at 691–95 and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–80 (1986)). Nonetheless, an action may be attributed to a municipality or municipal entity when: (1) the action was taken in compliance with a longstanding policy or custom; or (2) the action was taken by the municipality's final policymakers.  *Id.* at 1285 ("[A] municipality is responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality.").

"A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  After identifying an official policy or custom, the plaintiff must demonstrate causation by showing that the policy or custom "is the moving force behind the injury alleged."  *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (same).  Finally, the plaintiff must demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Cacioppo*, 528 F. App'x at 931 (quoting *Schneider*, 717 F.3d at 769).

Plaintiff raises two arguments in support of his municipal liability claim.  First, Plaintiff argues that Chaffee County failed to adequately supervise Defendant Stover and discipline her for her previous improper unlocking of cell doors.  [#39 at 15-18]  Second,

21

Plaintiff argues that Chaffee County "sent a clear message that [Defendant] Stover's conduct was consistent with its practices and customs not only by subjecting her to a mere slap on the wrist for causing Plaintiff very serious harm, but also by subjecting Plaintiff and [Mr.] Stephen to the same discipline for [Mr.] Stephen's criminal attack on Plaintiff."  [*Id.* at 18]  The Court addresses each argument in turn.

### 1.    Chaffee County's Alleged Failure to Adequately Supervise or Discipline Defendant Stover for the Prior Incidents

Plaintiff first argues that Chaffee County failed to adequately supervise Defendant Stover and discipline her for her previous improper unlocking of cell doors.  [*Id.* at 15-18]  Plaintiff argues that "Chaffee County officials were aware before [Defendant] Stover wrongly unlocked Plaintiff's door [that] she had improperly unlocked inmates' cell doors in the CCDC at least three other times."  [*Id.* at 15]  And one such occasion involved Defendant Stover improperly unlocking the cell door of an inmate in protective custody, which led to that inmate being physically attacked by another inmate.  [*Id.* at 16]  Thus, Plaintiff argues:

> [D]espite having notice that continued adherence to these customs was substantially certain to result in almost the identical injury suffered by [Plaintiff], Chaffee County consciously chose not to take appropriate actions to ensure . . . Chaffee County detention staff, and Defendant Stover in particular, complied with her constitutional duty to provide reasonable protection to inmates, and it was thus obvious that the failure to do so would almost inevitably cause a citizen like [Plaintiff] to suffer the deprivation of his constitutional rights in the manner that occurred here.

[*Id.* at 17-18]

The Court disagrees.  First, other than an alleged failure to impose sufficient discipline against Defendant Stover for her previous attempts, Plaintiff does not identify any particular deficiencies in Chaffee County's supervision.  *Cf. Hernandez v. City & Cnty.*

*of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *7 (D. Colo. Aug. 23, 2022) (dismissing municipal liability claim based upon a failure to train or discipline theory where the plaintiff "d[id] not set forth any facts concerning how [the officers] were trained, who trained them, or why their training was deficient").  And the three separate incidents, spanning Plaintiff's approximate five-year career, are not sufficiently similar to the instant case to demonstrate that some (unspecified) additional supervision was needed to avoid an almost inevitable constitutional injury.  The first occurred when Defendant Stover was in training and she accidentally hit the cell door button thinking she was hitting the button for the intercom.  [#43, SOF76]  No inmates were injured as a result.  [*Id.*]  The details surrounding the second incident are unclear, but it does not appear that any inmates were injured in that incident either.  [*Id.*; #41 at 11 (50:1-15)]

Finally, the incident where another inmate was injured involved Defendant Stover releasing an inmate (Mr. Roesch) from lockdown believing that all other cell doors had been locked.  [#42-2 at 5-8 (27:5-30-8)]  Defendant Stover believed that all doors were locked because the control room panel indicated that the doors were closed.  [*Id.*] Unbeknownst to Defendant Stover, another inmate had manipulated his door so that it would appear locked, even though it was not.  [*Id.*]  When Mr. Roesch exited his cell, he was attacked by the inmate that had manipulated his cell door.  [*Id.*]  Defendant Stover was issued a corrective action by CCDC because she was supposed to have waited for a guard to conduct a walk-through to ensure that all cell doors were closed prior to releasing Mr. Roesch from lockdown.  [*Id.*]

These three dissimilar incidents spanning five years are insufficient to demonstrate that some (again, unspecified) additional supervision was needed to avoid an almost

inevitable constitutional injury.  In only one instance was another inmate injured.  And that instance involved a manipulation of the cell door by another inmate that caused the control room panel to mistakenly indicate that all doors were closed.  Contrary to Plaintiff's assertion, these three dissimilar incidents would not make it "obvious" to Chafee County that it needed to improve its supervision to avoid the injury that occurred here—Defendant Stover either: (1) inadvertently opening the door because she mistakenly believed other guards were in front of Plaintiff's cell, or (2) intentionally opening Plaintiff's door because she considered Plaintiff a relatively difficult inmate, as Plaintiff seems to imply [#43, SOF70].

This then leads to whether Chaffee County may be held responsible due to its allegedly inadequate prior discipline of Defendant Stover.  Defendant Stover was not disciplined for the first incident, received a verbal discipline as a result of the second incident, and received a write-up as a result of the incident where Mr. Roesch was injured. [#43, SOF76]  And though Plaintiff argues that this discipline was "patently inadequate" [#39 at 17], Plaintiff fails to even suggest a more appropriate disciplinary measure, let alone present evidence (such as expert testimony) that greater disciplinary measures were needed to avoid an "almost inevitable constitutional injury." *Cacioppo*, 528 F. App'x at 931 (quoting *Schneider*, 717 F.3d at 769).  Simply put:

> [T]he evidence shows that Defendant [Chaffee County] chose to impose various forms of discipline against Defendant [Stover] when [her] prior conduct was determined to be inappropriate. . . . Plaintiff has not shown that under the circumstances of this case Defendant [Chaffee County's] failure to impose harsher discipline against Defendant [Stover] amounted to deliberate indifference to the constitutional rights of [Chaffee County's] inhabitants.

*Castille v. City & Cnty. of Denver*, No. 1:17-cv-009112-RM-SKC, 2020 WL 2800727, at *5 (D. Colo. May 29, 2020).  Thus, the Court concludes that Plaintiff has failed to present sufficient evidence of improper supervision or discipline related to Defendant Stover's prior cell opening incidents to survive summary judgment on his *Monell* claim.  *Id.*

### 2.    Chaffee County's Post-Incident Conduct

Second, Plaintiff argues that Chaffee County "sent a clear message that [Defendant] Stover's conduct was consistent with its practices and customs not only by subjecting her to a mere slap on the wrist for causing Plaintiff very serious harm, but also by subjecting Plaintiff and [Mr.] Stephen to the same discipline for [Mr.] Stephen's criminal attack on Plaintiff."  [#39 at 18]  The Court disagrees.  "Rarely if ever is the failure of a police department to discipline in a specific instance . . . an adequate basis for municipal liability under *Monell*."  *Schneider*, 717 F.3d at 777 (quotation omitted).  Here, Chaffee County suspended Defendant Stover without pay for one day, and placed her on three months' probation.  [#43, SOF79]  Without any evidence suggesting otherwise, the Court cannot conclude that this punishment for actions Defendant Stover described as accidental is so outrageous as to suggest that Defendant had a policy of condoning unconstitutional conduct by its control room operators, let alone that such a policy caused Plaintiff's injury.[9]  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir. 2019)

---

[9] Nor does the Court believe that the CCDC's choice of discipline for Mr. Stephen suggests that Chaffee County condones unconstitutional conduct by either Defendant Stover or CCDC's guards in general.  Similarly, Plaintiff fails to suggest any training that CCDC should have provided post-incident that would prevent future incidents like this from occurring.  [#39 at 18 ("Chaffee County also did not train Stover any differently based on the events underlying Plaintiff's case.")]  The Court thus cannot conclude that Chaffee County's decision to not impose a different type of training after the incident supports a *Monell* claim.

("[T]o the extent [the plaintiff] argues that [the discipline issued to the deputy who employed excessive force on the plaintiff] was itself too lenient, we note that a subsequent failure to discipline cannot be the cause of a prior injury."). Accordingly, the Court concludes that Chaffee County's conduct following the incident fails to support a *Monell* claim.

### 3.    Conclusion

Plaintiff has failed to present sufficient evidence to support his *Monell* claim against Chaffee County. Accordingly, the Motion is GRANTED to the extent it seeks summary judgment on Plaintiff's *Monell* claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [#30] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent it seeks summary judgment on the claim against Defendant Chaffee County. The Motion is **DENIED** to the extent it seeks summary judgment on the claim against Defendant Stover and **DENIED** to the extent it seeks summary judgment on the punitive damages demand against Defendant Stover.

DATED:  December 13, 2023                    BY THE COURT:

                                             s/Scott T. Varholak
                                             United States Magistrate Judge

26